```
          IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF ALASKA

                  ANCHORAGE DIVISION


MARTIN ANDERSON, an individual,

        Plaintiff,

v.              Civil Action No. 3:23-cv-000119 SLG

THE CITY OF SOLDOTNA, a municipal corporation;

and DAVID BOWER, an individual

        Defendants.
```

                    REMOTE STREAMING DEPOSITION OF

                                        DAVID BOWER


                                           TAKEN ON

                               THURSDAY, JULY 11, 2024

                                          9:27 A.M.


                                15 NORTH KOBUK STREET

                              SOLDOTNA, ALASKA 99669

Page 2

```
 1                REMOTE APPEARANCES
 2
 3  Appearing on behalf of the Plaintiff:
 4  THAD GUYER, ESQUIRE
 5  STEPHANI AYERS, ESQUIRE
 6  Guyer and Ayers & Friends, PC
 7  116 Mistletoe Street
 8  Medford, OR  97501
 9  (206) 535-2395
10  (813) 382-7865
11  thad@guyerayers.com
12  stephani@whistleblowerdefenders.com
13
14  Appearing on behalf of the Defendant:
15  KENDRA E. BOWMAN, ESQUIRE
16  Farley and Graves P.C.
17  807 G. Street, Suite 250
18  Anchorage, AK  99501
19  (907) 274-5100
20  kbowman@farleygraves.com
21
22  Also Present:
23  Vincent Guerrera, Naegeli Technician
24
25
```

Page 4

```
 1  EXHIBIT INDEX
 2                          Page
 3  (NONE MARKED)
```

Page 3

```
 1               EXAMINATION INDEX
 2                                        Page
 3  EXAMINATION BY MR. GUYER                  6
```

Page 5

```
 1          REMOTE STREAMING DEPOSITION OF
 2                    DAVID BOWER
 3                     TAKEN ON
 4               THURSDAY, JULY 11, 2024
 5                     9:27 A.M.
 6
 7          THE REPORTER:  Thank you for choosing
 8  Naegeli Deposition and Trial.  We are on the record
 9  at 9:27 a.m.
10          Mr. David Bower, please raise your right
11  hand.  Thank you.
12          Do you affirm under penalty of perjury
13  that the testimony you are about to give will be the
14  truth, the whole truth, and nothing but the truth?
15          THE DEPONENT:  Yes.
16          THE REPORTER:  Thank you.
17          Will each attorney please state their name
18  for the record, and then you may proceed.
19          MR. GUYER:  My name is Thad M. Guyer, and
20  I am an attorney for Mr. Anderson, and I will be
21  taking the deposition today.
22          MS. BOWMAN:  Kendra Bowman on behalf of
23  the City of Soldotna and David Bower.
24          THE REPORTER:  You may proceed.
25  DAVID BOWER, having been duly sworn, was examined,
```

(800) 528-3335  NAEGELI DEPOSITION & TRIAL  Established 1980  NAEGELIUSA.COM

**Page 54**

1 was towards the middle of it. I don't --
2    Q. Okay.
3    A. It was after I had got the search warrant
4 for searching the computer, I believe.
5    Q. Okay. So you did not make any effort to
6 talk to Mr. Anderson before you obtained the search
7 warrants; is that right?
8    A. That's correct.
9    Q. And did you make any effort to contact, to
10 interview Mr. Anderson before you transmitted your
11 report to the district attorney?
12    A. I can't remember if that was before I
13 transmitted to the DA's office. I can't remember.
14    Q. Okay, thanks.
15       When you obtained that second warrant, did
16 you consult with anybody who said that that's what
17 you should do?
18    A. Not that I can recall.
19    Q. You just did that out of an abundance of
20 caution?
21    A. I don't understand the question.
22       MR. GUYER: Okay.
23       MS. BOWMAN: Can I object and just say
24 that there's three search warrants. I think you're
25 referring to the third.

**Page 55**

1       MR. GUYER: Okay. Yeah, okay. That's
2 right. Okay, so what's the third search warrant?
3       THE DEPONENT: The third search warrant
4 was actually searching the computer.
5 BY MR. GUYER:
6    Q. Okay. So as I understand it, the first
7 two search warrants were office and home; is that
8 right?
9    A. Yeah. The first one was for the business.
10 The second one was for the home and vehicles, and
11 then the third was to search the computer.
12    Q. Yeah, okay. That's the one I'm talking
13 about. Okay. And because we talked about this a
14 little bit already, but so let me make sure that I
15 understand this, is was it your opinion that the
16 prior search warrants did not authorize you, they
17 authorized you to obtain the computer, to take
18 possession of the computer, but they did not
19 authorize you to search the contents; was that your
20 opinion?
21    A. That's correct.
22    Q. Okay. Did you talk to anybody to get any
23 guidance on whether or not you were correct in that
24 opinion?
25    A. I did not speak to anybody.

**Page 56**

1    Q. All right. Thank you.
2       Okay. Now there is a company involved in
3 this called Computer Renaissance; is that right?
4    A. Yes.
5    Q. And did you contact Computer Renaissance?
6    A. I did.
7    Q. And why did you do that?
8    A. To confirm that Mr. Anderson had brought
9 whatever the computer was from the business there
10 and made a copy of it. That was my reason for
11 contacting them.
12    Q. And how did you find out about Computer
13 Renaissance being, having any involvement with that
14 computer media?
15    A. I can't remember.
16    Q. And did you go to Computer Renaissance in
17 person?
18    A. I did.
19    Q. And what were you told there? What
20 information did you obtain?
21    A. I was told that Mr. Anderson's used them
22 for all of his computer work. And I was told that
23 the hard drive, I was told whatever external hard
24 drive I would be looking for would be this make
25 because that's all he sold, and I think that's

**Page 57**

1 pretty much it.
2    Q. Did you obtain from, in your view, from
3 Computer Renaissance any incriminating information?
4    A. I don't believe so. Not incriminating.
5    Q. Did you obtain from Computer Renaissance
6 any information that you viewed to be exculpatory
7 information?
8    A. Yes.
9    Q. Okay, what was the exculpatory
10 information?
11    A. That he did bring his computer there and
12 had it transferred to another computer and a new
13 software installed on the computer --
14    Q. Okay.
15    A. -- like they were saying. So just
16 confirmation of what was told me.
17    Q. Okay. And after receiving that
18 exculpatory information, did you discuss that with
19 any of your supervisors?
20    A. I believe so, but I don't remember for
21 sure.
22    Q. Do you remember what their reactions were?
23    A. I cannot remember.
24    Q. Okay. Now you went to Computer
25 Renaissance, actually, before you got the search

Page 58

1 warrants, correct?
2    A.  Yes, sir.
3    Q.  And did you view the information you got
4 from Computer Renaissance as helping you establish
5 probable cause to believe that a crime had been
6 committed?
7    A.  Yes, sir.
8    Q.  Okay. And what information did they give
9 you that led you to believe that you viewed as
10 supporting probable cause that a crime had been
11 committed? What was it they told you?
12    A.  They confirmed what the initial complaint
13 given to me was that the information was taken off
14 of a computer, put onto another computer, and that
15 was just confirmation of the initial report, so.
16    Q.  Did Computer Renaissance or the people you
17 talked to there, did -- I take it it was just one
18 guy there, wasn't it, that you talked to?
19    A.  There was two guys there.
20    Q.  Okay.
21    A.  The owner, and he had another employee,
22 but I can't remember.
23    Q.  Okay.
24    A.  I think it was the owner I spoke to,
25 mostly.

Page 59

1    Q.  Did anybody from Computer Renaissance say
2 to you that they found that Mr. Anderson's actions
3 with respect to these computers to be suspicious in
4 any way?
5    A.  Not that I can remember.
6    Q.  Okay. I mean, did anybody from Computer
7 Renaissance say, indicate to you that they thought
8 Mr. Anderson probably had done something wrong?
9    A.  I can't remember.
10    Q.  Okay. Did you have enough experience with
11 computers either through your police work or just
12 your individual work such that you know that it is
13 not uncommon to have computer media erased?
14    A.  It's not uncommon to erase computer media,
15 no.
16    Q.  Okay. So, for example, if you're going to
17 sell a computer or give it to your kid for college
18 or something, you would agree with me that there's
19 nothing suspicious about having everything erased
20 from it first?
21    A.  Yes. Sounds reasonable.
22    Q.  All right. Thanks. So there was nothing
23 inherently suspicious about what you learned at
24 Computer Renaissance. It was combining what you
25 learned with Computer Renaissance with what the

Page 60

1 statements are of the alleged victim.
2    A.  Correct.
3    Q.  Okay. And basically what it is, the
4 alleged victim said, "He took the computer. He then
5 brings the computer back, it's been erased, and
6 therefore we have been deprived of our intellectual
7 property," correct?
8    A.  Correct.
9    Q.  And what you thought was supportive of
10 probable cause for Computer Renaissance was they
11 confirmed that yes, we have erased computer media
12 for Mr. Anderson, correct?
13    A.  Correct.
14    Q.  All right. Now prior to you taking
15 retirement, you were suspended, correct?
16    A.  Administrative leave.
17    Q.  Administrative leave. And that
18 administrative leave had nothing to do with Mr.
19 Anderson's case; is that correct?
20    A.  That's correct.
21    Q.  Okay. I want to ask this as respectfully
22 as I possibly can, but from time to time some of us
23 have, we develop drinking problems. In the period
24 of time that you were working on Mr. Anderson's
25 case, did you have a drinking problem?

Page 61

1    A.  No, sir.
2    Q.  And did anybody tell you you had a
3 drinking problem in that period of time, except you
4 just didn't agree with them?
5    A.  No, sir.
6    Q.  Did you later develop a drinking problem?
7    A.  No, sir.
8    Q.  Okay. You said you went to a trial in
9 your case and you were acquitted, right?
10    A.  Correct.
11    Q.  Did the topic of alcohol consumption by
12 you come up in that trial?
13    A.  It did.
14    Q.  And do you know whether or not the police
15 department, SPD itself, undertook any inquiry into
16 whether or not you had a drinking problem?
17    A.  Yes.
18    Q.  They did?
19    A.  Yes.
20    Q.  And how did you find out about that?
21    A.  Interview with the, during the AI.
22    Q.  During the AI on what?
23    A.  Administrative. I had a second
24 administrative investigation.
25    Q.  Which had nothing to do with Mr. Anderson?