IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA AT ANCHORAGE

MARTIN ANDERSON, an
individual,

        Plaintiff,

  vs.

THE CITY OF SOLDOTNA,
a municipal corporation;
and DAVID BOWER, an
individual,

        Defendants.

Case No. 3:23-cv-000119 SLG

CONTAINS CONFIDENTIAL PORTION

# ORIGINAL

/

**VIDEOTAPED DEPOSITION OF MARTIN ANDERSON**

(CONFIDENTIAL PORTION OF TRANSCRIPT PAGES 47 THOUGH 57)

Pages 1 - 165, inclusive

Thursday, September 5, 2024
10:06 a.m.

Taken by Defendant
at
Peninsula Reporting
110 Trading Bay Drive, Suite 100
Kenai, Alaska 99611

Reported by: Leonard J. DiPaolo, RPR, CRR, CCP

1  years prior to my hire.  So 2021 minus six would be
2  what, 2015, I believe, or something like that.
3      Q.  And have you ever had any ownership interest in
4  Precision?
5      A.  No.  I was strictly an employee.
6      Q.  And do you recall what the business address
7  was, is, in May of 2021?
8      A.  Their corporate or Alaska?
9      Q.  Alaska.
10     A.  I know it was on Funny River Road.  It would
11 have been located at the Soldotna airport.  I don't
12 have the exact address available.
13     Q.  And if I represented 47801 Funny River Road,
14 does that sound correct to you?
15     A.  That sounds familiar.  And there would have
16 been a suite associated with it as well.
17     Q.  And do you remember what the suite number was?
18     A.  I do not.
19     Q.  My recollection from prior depositions was that
20 it was -- the office was located maybe in an airplane
21 hangar, is that correct?
22     A.  That is correct.  There were a series of
23 airplane hangars.  This particular hangar was
24 unoccupied, and we turned it into an office and a shop.
25     Q.  So I'm curious as to what that would look like.

1     A.  It was separated by a window, a wall, and a
2  door.  And the door was kept locked when either Megan
3  or I were not there because it did have confidential
4  records there, HR records, drug testing of the
5  employees, so on and so forth.
6     Q.  And did you have your own separate office, or
7  were you and Ms. Tolliver together in one room?
8     A.  We were together in the same office, in the
9  same room.
10    Q.  I'm sorry, what was Ms. Tolliver's position?
11    A.  She was the administrative assistant.  She was
12  also a field technician.  But her primary duties at
13  that time were to basically assist me as a regional
14  manager.
15    Q.  Was she in the office full time?  Did she work
16  out of the office full time?
17    A.  At this point, yes.
18    Q.  And the other hangar -- hangars, units, were
19  they leased out to other people or businesses?
20    A.  I did see people enter and exit.  And they were
21  occupied, but I couldn't tell you by what business or
22  by whom.  I believe the owner at the time was a Derek
23  Leichliter, who was actually killed in a plane accident
24  on Kodiak Island a few months later.
25    Q.  Any idea on how to spell his last name?

```
 1      A.   I could get it.  I don't have it available.  I
 2   know his father was a former state trooper.  His mother
 3   worked as a secretary, I believe, at Cook Inlet
 4   Academy.  I don't have his -- I'm sure it would be on
 5   the lease, a copy of the lease.
 6      Q.   And who entered into a lease on behalf of
 7   Precision?
 8      A.   Trent Loney, the president of Precision.
 9      Q.   And do you, if you know, how long they had been
10   located at the airport in that unit?
11      A.   I believe the lease started on May 1st, to the
12   best of my recollection.  May 1st of 2021.
13      Q.   Do you still work for Precision?
14      A.   I do not.
15      Q.   When did you stop working?
16      A.   It would have been the first week of January.
17   I think I was actually paid through the end of January
18   of 2023.
19      Q.   And why -- what was the circumstances for your
20   departure from their employment?
21      A.   There was a request by Mr. Loney to travel
22   extensively in the Lower 48 doing business development,
23   which would have been a positional change from what I
24   currently had.  And I didn't want to be absent from my
25   family more than what I already was.  But we left on
```

```
 1       Q.  And your complaint indicates for all relevant
 2   times, your home dwelling where you reside with your
 3   family is in Sterling, Alaska, is that correct?
 4       A.  That is correct.
 5       Q.  And then that you also stated therein, and I'm
 6   not quoting, but that you conducted business from your
 7   home office located in your dwelling, in your home
 8   dwelling in Sterling, is that correct?
 9       A.  That is correct.
10       Q.  And so when you were hired by Precision, how
11   often would you go into the office?
12       A.  Would this be taking into account my travel as
13   well?
14       Q.  Yeah, taking into account your travel as well.
15       A.  I would say, if I would have to estimate now
16   three years into the future, I would say probably 20 to
17   25 percent of my time was spent at the office at the
18   Funny River location in Soldotna.
19       Q.  Okay.  And then between the date that you
20   started, which I believe you testified was May 1st,
21   2021, and --
22       A.  Oh, excuse me, I must correct you.  You said
23   when did they open the office was May 1st.
24       Q.  When were you hired?
25       A.  I believe it was April, I want to say 18th,
```

1  somewhere in that area.  Could have been a little bit
2  earlier, but without documentation in front of me, I
3  couldn't -- but I know it was the first week of April,
4  first, second week of April.
5       Q.  Sure, I'll rephrase my question.
6           From the date they opened the office on
7  May 1st, 2021 and June 1st, 2021, had you spent any
8  time in the office?
9       A.  Yeah, I was in the office, again I would say,
10 probably 25 percent of the time.  Probably a quarter of
11 my time.  I did a lot of local business development, so
12 in offices of clients, having lunch.  There was travel
13 included in there.
14      Q.  Did anyone else work -- any other employees
15 work in the Precision office in Soldotna?
16      A.  Yes.  My son James Anderson.  There would have
17 been also Robert Trejo and Vickie Trejo.  Last name I
18 believe the spelling is T-r-e-j-o.
19      Q.  And did they have, you know, a desk and an area
20 to work as you and Ms. Tolliver did?
21      A.  We had just set up a folding table outside of
22 our office, and I believe they worked off of that
23 folding table when they were in the office.  But the
24 majority of their time they were in the field
25 performing inspection services.  But they would have to

1   Q.  And what proprietary information specifically
2   did they allege you took from them?
3   A.  I believe it was training material.  I believe
4   it was a client list.  I believe it was -- I believe it
5   was training material, client list.  I don't remember
6   beyond that.  But I believe that was their two primary
7   bases of their claim, according to them.
8   Q.  And were you represented by an attorney in that
9   lawsuit?
10  A.  I was.  I had retained Danielle Vanderzanden, I
11  believe, around April 13th.  Actually, let me back up
12  on that.
13          I had retained Dani Vanderzanden on April
14  13th in preparation of filing a lawsuit against them.
15  So when they filed their lawsuit against me, two months
16  later I had already had her under retention, and she
17  became my attorney representing me for their lawsuit
18  against me.  Is that clear?
19  Q.  Did you ever file a lawsuit against Trident?
20  A.  I did.
21  Q.  And when did you file that lawsuit?
22  A.  June 8th, 2021.
23  Q.  And where was that filed?
24  A.  In the state of Maine, a federal lawsuit.
25  Q.  And what were the allegations you made against

1  out.
2     Q.  What did I hand you?  Oh, it just misstapled.
3     A.  Oh, okay.
4     Q.  Just the order is wrong.  I'll just restaple
5  it.  Just stapled on the wrong side.
6     A.  I've done it myself.
7     Q.  Okay.  So I'll reask my question.
8          Do you see where it states, "Being duly
9  sworn, I state that I have reason to believe..." and
10 then on -- the first box is checked, it says, "on the
11 person of Martin T. Anderson --"
12    A.  Uh-huh.
13    Q.  -- and then, "on the premises known as 36696
14 Kimball Court, Sterling, Alaska," do you see that?
15    A.  Yeah.  Then it says, "at Soldotna."
16    Q.  Uh-huh, yep.
17    A.  And the second box is not checked.
18    Q.  Correct.
19    A.  Okay.  Yes, I see that.
20    Q.  Is 36696 Kimball Court your home address?
21    A.  It is.  Sterling, Alaska, not Soldotna.
22    Q.  And was that your address at the time of --
23 this was issued?
24    A.  Yes, it would have been.
25    Q.  Okay.  And was this search warrant ever served

1           VIDEOGRAPHER:  This is the beginning of
2    disk 2 in the deposition of Martin Anderson.  We move
3    back on record at 12:16.
4    BY MS. BOWMAN:
5        Q.  Okay, I'm going to hand you what's been marked
6    as defendant's deposition Exhibit C.  And at the top
7    you'll see Eric Derleth's e-mail.  And you see that
8    you're cc'd, Mr. Anderson?
9        A.  Uh-huh.
10       Q.  And what's the date on it?
11       A.  June 1st, 2021, 8:15 a.m.
12       Q.  And can you tell me what the e-mail states?
13       A.  This is addressed to Officer Bower from Eric
14   Derleth, and it says:  I represent Martin Anderson with
15   respect to the search warrant you secured.  It has been
16   out of -- he's been out of state and returned on
17   Sunday.  Can we make a time for him to bring his
18   subject laptop to the SPD.
19       Q.  And did you bring in the laptop to SPD?
20       A.  I did.  I was compelled through the search
21   warrant to do that.
22       Q.  Did Officer Bower serve you with a search
23   warrant?
24       A.  At my place of residence.
25       Q.  At your place of residence?

```
 1       A.   I'm sorry, at my place of business.
 2       Q.   He left a copy of the search warrant there?
 3       A.   He showed it to Ms. Tolliver to gain access.
 4       Q.   But he never handed you a search warrant, did
 5  he?
 6       A.   No.
 7       Q.   Okay, and what date did you bring in the
 8  laptop?
 9       A.   June 1st, 2021.
10       Q.   And underneath that first page -- I think
11  I might have -- did I hand you two copies of that?  I'm
12  missing my copy.
13            MR. GUYER:  Yeah.  Would you like one
14  back?
15            MS. BOWMAN:  Please.
16  BY MS. BOWMAN:
17       Q.   On the next page it's a motion to suppress two
18  search warrants that was filed by your attorney, Mr.
19  Derleth.  Do you see that?
20       A.   I do.
21       Q.   It starts at -- okay.
22            And then if you go to Anderson 540, which
23  is the Bates number at the bottom, do you see that,
24  Anderson 540, and it's your affidavit?
25       A.   Oh.
```

```
 1   accurate reading of that complaint paragraph?
 2       A.  Yes.
 3       Q.  So my question is, what evidence is there that
 4   Officer Bower had any knowledge of the OSHA or IC3
 5   complaint filed -- you filed?
 6       A.  So at any time?
 7       Q.  No.
 8       A.  Prior to the implementation of the search
 9   warrant?
10       Q.  Yes.
11       A.  I don't have any knowledge specifically prior
12   to the search warrant.
13           But, again, when we go back to proceeding
14   recklessly, you asked me in this deposition prior to
15   starting about any civil or various legal backgrounds,
16   workers' comp, that type of thing.  I would think that
17   a reasonably trained officer would have asked them if
18   there were any lawsuits or any other civil actions that
19   were involved in this to see or to decide whether or
20   not there may be some motive.  And I believe actually
21   in Officer Bower's deposition he did admit that he had
22   some suspicions that this could have been retaliatory.
23       Q.  Sure, and that's fine.  But that's not my
24   question.
25           My question is, what evidence do you have
```

1   that Officer Bower acted in retaliation in seeking the
2   search warrant?
3       A.  Well, I believe -- I don't believe that he -- I
4   don't have any knowledge, excuse me, not believe -- I
5   don't have any knowledge that he was in conspiracy with
6   Trident.  But I believe, whether it was willing or
7   unwilling, he was definitely an accomplice.
8               As you look through all of the many
9   e-mails between Russell Pack and Officer Bower and
10  Russell Pack and -- I'm sorry, James Hall and Officer
11  Bower, there were many different discussions about the
12  case, when he was receiving the search warrants, when
13  he applied for the search warrant, when he was going to
14  enact the search warrants.
15              And so whether he was willing or
16  unwilling, he was definitely an accomplice in the
17  retaliation of Trident using Officer Bower and the
18  Soldotna Police Department as a tool.
19      Q.  Okay.  But that's, again, not my question.
20              My question is specific to you filing a
21  complaint against Trident with OSHA and IC3.
22      A.  I think I answered your question.  I said I had
23  no knowledge of him prior to.  But as far as being a
24  component or an accessory to the retaliation, I believe
25  he has responsibility --