IN THE DISTRICT/SUPERIOR COURT STATE OF ALASKA
THIRD JUDICIAL DISTRICT KENAI

In the Matter of:                                          )
                                                           )
Search Warrant 3KN-21-00076SW, and                         )
Search Warrant 3KN-21-00077SW.                             ) Case no. 3KN-21-00076SW
_____) Case no. 3KN-21-00077SW

MOTION TO SUPPRESS TWO SEARCH WARRANTS

Martin "Marty" Anderson moves to suppress[1] any evidence gathered based on the two search warrants

listed above because (1) the police submitted false and misleading evidence from the alleged "victim" in the case;

and (2) after correction for the false evidence and addition of the true facts left out, there is a lack of evidence to

support probable cause to search Mr. Anderson's computer and hard drive.

I.        Introduction and Issues Presented

        Basically, after graduating from Soldotna High School in 1982, Marty Anderson has been a well-

respected and highly-credentialed member of our local business community for many decades where he works

and extensively trains others in the oil and gas industry. Marty has owned multiple businesses and worked for

others, frequently engaging in complicated "non-destructive testing" (NDT) for a living.  Nondestructive testing

is a wide group of analysis techniques used in science and technology industry to evaluate the properties of a

material, component or system without causing damage.  NDT methods rely upon use of electromagnetic

radiation, sound and other signal conversions to examine a wide variety of articles for integrity, composition, or

condition with no alteration of the article undergoing examination. Until the search warrants in this case were

requested, no one to his knowledge has ever accused Marty Anderson of doing anything unethical, let alone

illegal. That is, until he caught the President of Trident Engineering and Inspection, engineer James Hall, illegally

hacking his computer and email and reported this illegal activity (and more) to the FBI.

_____

[1] This motion is brought pursuant to Criminal Rule 37, the Fourth and Fourteenth Amendments of the United States Constitution and
    Article 1, §§ 14 and 22 of the Alaska Constitution.

EXHIBIT U
Page 1 of 23

ERIC DERLETH
Trial Lawyer

388 Health Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-8615

Despite having never been charged with a crime in his life, the Soldotna Police Department was tricked into believing that Marty Anderson "stole" data from Trident Engineering and Inspection (a Maine corporation that has only been in Alaska for a very brief period, and already closed up shop having failed here). In reality, Trident's President, James Hall, illegally hacked Marty Anderson's private information and got caught; Trident's illegal activity and Marty's discovery and disclosure of it led directly to the theft allegation in order to harm and punish Marty Anderson for reporting Trident's illegal activity.

But the court does not have to take Marty Anderson's word for it – instead, the court need only look at the documented timeline of what happened before Trident falsely portrayed itself as a victim:

1. <u>Prior</u> to Mr. Hall and his partner Russ Pack reporting the alleged "theft" to SPD, Trident purportedly hired Marty Anderson in a sham employment agreement, only to fire him the following day based on lies that he violated Trident's "policies and procedures" (despite that there was no time for him to violate anything since he was almost simultaneously hired and fired).

2. <u>Prior</u> to Trident (Pres. James Hall and VP Russ Pack) reporting the alleged "theft" to SPD, Marty Anderson discovered that Trident had illegally accessed and surveilled him through the surreptitious acquisition of his private email password(s) that were hosted on the server Brinkster.com (a server Marty had used for nearly two decades).

3. <u>Prior</u> to Trident reporting to SPD that Marty Anderson "stole" their data, Marty had already reported Trident's illegal hacking to the FBI via the DOJ cyber-hacking web portal known as the **Internet Crime Complaint Center (IC3)**.

4. <u>Prior</u> to Trident reporting the alleged theft, on April 17, 2021, Marty emailed the President and VP of Trident (James Hall and Russ Pack) and staff at the local Trident office, that he discovered Trident's illegal hacking and surveillance, which had been going on for months and included his post-termination period. Marty included in the email that he reported the hacking to Alaska Troopers and the FBI.

RE: Motion to Suppress Two Search Warrants

EXHIBIT U
Page 2 of 23



**ERIC DERLETH**
— Trial Lawyer —

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-8815

5. <u>Prior</u> to Trident reporting the alleged theft, Marty repeatedly had to track down his own email that was hosted by Brinkster.com, having found that it was moved to something called Zimbra.com. After Marty found his email on Zimbra.com, he changed his password again (this time on April 9, 2021). Despite changing the password, again Marty was unable to login to his email three days later. Marty called Brinkster.com and they provided him the new password: **JamesHall123456** (Again, "James Hall" is the name of the President of Trident.)

6. <u>Prior</u> to Trident reporting the alleged theft, Marty did a security scan of his personal computer on April 9, 2021, which indicated his personal email was accessible by one application, listed as: "Trident Alaska" and associated with his personal email <u>martya@usalaska.biz</u> – there was no reason for this email to be associated with Trident Alaska.

7. <u>Prior</u> to Trident reporting the alleged theft, Marty also found that his LinkedIn.com account was hacked and some unknown person posted his former business known as **Alaska Technical Training** website on his LinkedIn home page, where it also listed two Trident-owned domains: AlaskaNDT.com and AlaskaNDT.org. Notably, Alaska Technical Training is the same business that Marty Anderson sold to Texas company Southern Services, Inc., which in turn sold the business to Trident.

8. <u>Prior</u> to Trident reporting the alleged theft, Marty contacted OSHA and made a whistleblower complaint for numerous safety violations that he observed while working as a contractor to Trident, and he spoke to OSHA personnel about these allegations a few days later.

9. <u>Prior</u> to Trident reporting the alleged theft, Trident learned through its illegal access into Marty Anderson's email that he received two job offers just after his sham termination, one offer from Precision NDT in New Mexico and the other from Blackhawk Engineering in Illinois. This led to Trident's lawyer sending both employers threatening so-called "Cease and Desist" letters, essentially accusing Marty of misappropriation without evidence to try to get him fired (again).

RE: Motion to Suppress Two Search Warrants

EXHIBIT U

**ISSUE #1:**

Can the search warrant stand when the alleged "victim" intentionally left out the facts cited above, all of which it was aware, which suggest a strong motive to make up a false allegation of theft against Marty Anderson to artificially harm his credibility?

**ISSUE #2:**

Can the search warrant stand when the true facts that led up to its issuance are properly included in the affidavit in support thereof?

II.    **Search Warrant Proceedings**

Two search warrants were issued, identified in the caption above, by Judge Martin Fallon on May 19, 2021. The sole witness for the police was well-experienced Soldotna Police Officer David Bower. He swore out an affidavit in support of a search warrant, but virtually all the information Bower came directly from Trident President James Hall and VP Russ Pack – all of which was told to Ofc. Bower <u>after</u> Trident learned that Marty Anderson discovered Trident's illegal hacking and reported it to the FBI. [**Exhibit A,** Affidavits in Support of Search Warrants 3KN-21-00076SW and 3KN-21-00077SW, notarized on May 18, 2021] The following are key "facts" provided to Ofc. Bower that are untrue or misleading once put into their true context:

A.    Marty Anderson was never an employee of Trident Engineering and Inspection; instead, Trident lied to Marty repeatedly to trick him into signing a sham employment agreement in order to gain an advantage over him and save themselves thousands of dollars, only to fire him the next day based on trumped up allegations.

B.    Trident pretended to "hire" Marty Anderson, just to fire him, but never followed through with the hiring process because it was all a ruse to gain leverage over him and save thousands of dollars; therefore, Trident's claim to Ofc. Bower that Marty "stole" their intellectual property while their employee was just a sham to try to harm him given his unwillingness to just accede to their every demand of him during the negotiation process.

C. Marty Anderson did not bring in either an "external hard drive" or his personal computer (identified properly as a **Dell Latitude 5440**) to Computer Renaissance on March 22, 2021 – which was actually one day before his sham "hiring" by Trident. Instead, Marty brought his personal laptop to Computer Renaissance six months earlier because it had problems. Marty over the years always maintained two computers that were essentially mirror images, his personal and one owed by the business, in order to never be without one. This standard operating procedure was well-known to Southern Services, Inc., his employer and predecessor to Trident, and the intent was to make sure Marty always had all of his years of work in a working computer.

D. Marty did not first make the request to clone/mirror the company's laptop on March 22, 2021; rather, that request was made in September 2020 and was a standing order with Computer Renaissance so that he would always have at least one fully functioning laptop.

E. Marty returned the company laptop on March 26, 2021 – but he did <u>not</u> install a "new Windows 10" operating system because that was already on it. Marty did, however, return a clean version because he had years of private information on both laptops, much of which he was required to maintain the integrity of due to his many certifications and licenses. He has always maintained the integrity of that work product to protect current and prior customers, and to be able to survive an audit of his work based on the requirements of his licenses/certificates which include:

    1) Certification or training documents as it relates to ASNT or AWS certifications including but not limited to:

        i. Any records that document Marty Anderson performed training under his ASNT NDT Level III or AWS CWE number or IRRSP (Radiation Safety) certification #72743 including as a minimum, formats, agenda, attendance sheets and training documents issued from 2005 to current.

ERIC DERLETH
Trial Lawyer

398 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-8815

Case 3:23-cv-00119-KFR    Document 34-22    Filed 05/06/25    Page 5 of 23
EXHIBIT U
Page 5 of 23

ERIC DERLETH
Trial Lawyer

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-8815

ii. Any document, or documents relating to, Marty's signature/attestation of personal qualification, certification, or training and as it relates to the ASNT/AWS ethics agreement signed by him.

2) Documents pertaining to the use of Marty's personal authorized inspector/certification status including but not limited to:

i. Documents in which he was the authorized inspector/auditor as it relates to his personal certifications including but limited to ASNT, AWS, API, NACE, SSPC, AQS, etc.

ii. Documents where Marty signed, approved, or reviewed for technical competency including inspection reports, final reports, and recommendations/direction.

3) Documents as it pertains to Marty's former management responsibilities for SSI such as: Safety, Quality, HR (DOL) 11/01/2018 to 03/16/2021. This includes that Marty filed an OSHA complaint for safety violations that had not been corrected as he documented in meeting notes and tracking checklists.

4) Documents retained in the event of OSHA, DOL including HR records, employee interviews, evaluations and remediation actions. Meeting notes, logs or tracking documents showing request for safety deficiencies and request for resolution.

5) Documentation as it relates to the IC3 (DOJ-FBI) complaint filed against Trident/James Hall on 04/12/2021.

6) Upon filing the IC3 complaint, the IC3 website instructed Marty to retain all documentation associated with his internet crime complaint. Since Marty believes the first evidence of unauthorized access was 12/28/2021 and confirmation was established in April 2021, all documents on Marty's former SSI and current personal laptop have been retained as instructed by the FBI due to the cyberhack of his computer system and email.

RE: Motion to Suppress Two Search Warrants

F. Below is a list of the primary Certifications / Classifications that Marty Anderson has obtained and maintains to do his job:

1. AWS — Senior Certified Welding Inspector #07100028
2. AWS — Certified Radiographic Interpreter #0907001N
3. AWS — Certified Welding Educator (SMAW, FCAW, GMAW) #1007015E
4. ASNT — VT NDT Level III (Visual Testing) #72743
5. ASNT — PT NDT Level III (Penetrant Testing) #72743
6. ASNT — MT NDT Level III (Magnetic Particle Testing) #72743
7. ASNT — RT NDT Level III (Radiographic Testing) #72743
8. ASNT — UT NDT Level III (Ultrasonic Testing) #72743
9. ASNT — ML NDT Level III (Magnetic Flux Leakage) #72743
10. ASNT — ET NDT Level III (Electromagnetic Testing) #72743
11. ASNT — IRRSP (Radiation Safety) #72743
12. API — 653 Certified AST Inspector #1328
13. API — 570 Certified ISP Inspector #0338
14. API — 577 Certified Weld Inspection and Metallurgy #72506
15. STI — SP-001 Certified AST Inspector #AC44387
16. NACE — Certified Senior Corrosion Technologist #6448
17. NACE — Certified Coating Inspector Level III #2295
18. SSPC — Certified Insulation Inspector #116770
19. SSPC — Certified Fireproof Inspector #118247
20. SSPC — Protective Coatings Specialist #2021-114-445
21. Six Sigma — Yellow Belt #D4PU2fo2rf
22. ASQ — Certified Quality Auditor (CQA) #71624
23. Army/Navy (CQM) Construction Quality Management
24. University of Alaska Anchorage Certificate in Welding Technology
25. University of Alaska Anchorage Certificate in Non-Destructive Testing
26. TEAM/SSI Leak Testing (LT) and Infrared (IR) Level II
27. Previous — Gas Metal Arc Welding (Pipe & Structural)
28. Previous — Shielded Metal Arc Welding (Pipe & Structural)
29. Previous — Flux Core Arc Welding (Pipe and Structural)

RE: Motion to Suppress Two Search Warrants

ERIC DERLETH
Trial Lawyer

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-6815

G. Marty did return the company laptop on March 26, 2021 – but he did not "steal" any data from it because every time that computer was connected to the Internet it connected to Trident's server and backed-up all the data. There was never any "stolen" data and nothing that exists was kept from Trident. Indeed, not one piece of data "stolen" (kept from Trident) was identified by Ofc. Bower is his application for a search warrant.

H. There is no "IT Department" at Trident; instead, upon information and belief, the "IT Dept" is just one of the partners, probably James Hall (President of Trident).

I. There was no explanation of who in the "IT Dept." valued the "stolen" data at over $31,000, and it certainly was not acknowledged that nothing was stolen because Trident had every piece of data they alleged that Marty Anderson wrongly took with him. That is not a small point: Trident has all the data, so if there is a complaint that Marty Anderson also has a copy they can file a civil lawsuit against him if they want. Retention of some data, given Marty's history of maintaining that data as described above to protect customers, the company, and his licenses/certifications, is not theft.

J. Likewise, if Trident's material complaint is that they think Marty Anderson wrongly shared Trident's proprietary data with anyone outside the company, that is what civil court is for – it does not resemble theft. What amounted to computer crimes is what Trident did to Marty Anderson by illegally accessing his computer and surveilling everything he did for months surreptitiously.

K. Instead of backing up its allegations that Marty Anderson wrongly shared is proprietary information, Trident went after him with criminal allegations and misled Ofc. Bower to accomplish this. Despite how much reasonable doubt is obvious in this case, being charged with a crime would devastate Marty Anderson's career since his work is based in large part on his credibility and reputation as an honest steward and teacher in his various roles within the oil patch. To that end, Marty served his local community for 15 years on the Kenai Peninsula Borough School Board as a member from 2003 – 2018. He also served on many other boards and committees, including this sampling:

ERIC DERLETH
Trial Lawyer

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-8815

EXHIBIT U
Page 8 of 23



**ERIC DERLETH**
— Trial Lawyer —

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-8815

1)  State of Alaska Workforce Investment Board (Appointed by Governors Parnell and Palin) from 2009 - 2013

2)  American Society of Non-destructive Testing (ASNT) Board of Directors Board Member (CMC Director) (2017 - 2020)

3)  ASNT National Committee T&E Chairman for MFL (2010 - 2017)

4)  ASNT Certification and Management Council VT-MFL Chair (Administrative Body-program maintenance chair) (2010 to current)

5)  ASNT NDT Publications Review Committee (2015 - 2020)

6)  ASNT Awards Committee member (2013 to current)

7)  ASNT (Alaska Chapter) – Board of Directors Secretary (2006 - 2007), Vice-Chairman (2009) and Chairman (2010 - 2017)

L.  Unexplained in the search warrant application is how Trident's "IT Department" was able to provide Ofc. Bower a "list detailing" the data stolen – <u>unless Trident still has the data.</u>

## III.  Points and Authorities

The Fourth Amendment unambiguously states that "no Warrants shall issue, *but upon probable cause*, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[2]  Probable cause is established if known facts and circumstances support a reasonable belief that an offense has been committed.[3]  Probable cause is determined objectively[4] and requires a fair probability or substantial chance of criminal activity.[5]

---

[2] U.S. Const. amend. IV (emphasis added); Ak. Const. Art. 1, § 14 (The protection afforded under the Alaska constitutional provision is substantially the same as the fourth amendment to the United States Constitution, but is broader in its extension of protection to "other property," as well as persons, houses, papers, and effects).

[3] <u>McCoy v. State,</u> 491 P.2d 127 (Alaska 1971) <u>(adopting Brinegar v. United States, 338</u> U.S. 160 (1949)).

[4] <u>Keller v. State, 543</u> P.2d 1211 (Alaska 1975).

[5] <u>State v. Joubert,</u> 20 P.3d 1115 (Alaska 2001).

RE: Motion to Suppress Two Search Warrants

Whether an affidavit contains sufficient facts to establish probable cause for the issuance of a search warrant "is a question of constitutional stature."[6] "It is imperative that a [Judge] be presented with adequate supporting facts, rather than mere affirmations of suspicion or belief."[7] Case law holds that probable cause – for search warrants or for legal arrests it is the same – cannot be established with a "paucity" of supporting facts, instead there must be something more: Some "incriminatory value" from which to conclude that suspect behavior is criminal in nature. When examined by comparison to the case law discussed below, the facts supporting Search Warrants 3KN-21-00076SW and 3KN-21-00077SW do not establish probable cause.[8]

In Saucier v. State,[9] the Alaska Court of Appeals explained the concept that "something more" was required to establish probable cause – something more than just some facts that might suggest a crime. In that case, Seward Police Officer Gary Byrnes was driving behind defendant Mr. Saucier's vehicle. Byrnes watched Saucier operate his vehicle for the length of a city block with his left tires on the center line of the road and then watched Saucier operate his vehicle with his left tires over the center line.

After Saucier pulled into a parking space, Byrnes turned on his overhead lights, walked up to Saucier's car, asked for Saucier's driver's license, and asked Saucier to exit his vehicle. Upon exit, Saucier admitted to drinking a "couple of beers" and the officer admitted that he noted a "normal" odor of alcohol on Saucier. Byrnes requested that Saucier perform field sobriety tests, Saucier refused, and Byrnes arrested Saucier for driving while intoxicated without any more evidence to suggest he was driving impaired.

---

[6] Keller, 543 P.2d at 1215.

[7] Id. (footnote omitted).

[8] State v. White, 707 P.3d 271 (Alaska Ct.App. 1985) (Review of the warrant is limited to the four corners of the search warrant application.).

[9] 869 P.2d 483 (Alaska Ct.App. 1994).

RE: Motion to Suppress Two Search Warrants

COSH 0700

ERIC DERLETH
Trial Lawyer

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-8815

EXHIBIT U
Page 10 of 23

Following his arrest, Saucier argued that probable cause did not exist. The trial court disagreed. Saucier appealed. The Court of Appeals agreed with Mr. Saucier and held that probable cause for his arrest did <u>not</u> exist. The <u>Saucier</u> court stated:

> Saucier's manner of driving did not strongly suggest that his control of the vehicle was impaired. The odor of alcohol Byrnes detected indicated that Saucier had consumed some amount of alcohol, as he admitted that he had. However, the law prohibits driving while intoxicated, not driving after having had a drink.[10]

The <u>Saucier</u> Court concluded: "The paucity of supporting facts is what distinguishes this case from those in which we have found probable cause to arrest for DWI."[11]

Applying this concept of "something more," the Alaska Court of Appeals in <u>Carter v. State</u> held that evidence sufficient to establish probable cause must have some "inherent incriminatory value." 910 P.2d 619 (Alaska Ct.App. 1996). There, police applied for a search warrant to search for evidence of a marijuana growing operation. The search warrant was supported by two affidavits. The first affidavit detailed four anonymous tips received by police over a period of three years. These anonymous tips alleged that Carter was involved in drug-related activities. The second affidavit summarized electrical consumption at Carter's residence.

An employee of the electrical company later testified to the contents of the second affidavit. The employee swore that Carter's electrical consumption was initially within normal parameters, but that Carter's energy consumption subsequently became inconsistent with the external weather patterns; the employee interpreted this change as evidence that "something else other than normal household usage [was] taking place."[12] Thus, the employee concluded that the electrical use pattern was very consistent with growing marijuana.



ERIC DERLETH
Trial Lawyer

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-6915

---

[10] 869 P.2d at 486.
[11] 869 P.2d at 485.
[12] 910 P.2d at 622.

RE: Motion to Suppress Two Search Warrants

The search warrant was issued. Defendant Carter argued that probable cause did not exist and the trial court disagreed. Carter appealed and the Court of Appeals held that probable cause did <u>not</u> exist, holding:

> In considering this issue, we must note that at the outset that utility records showing unusual electrical consumption have no inherent incriminatory value. There are many common and legitimate uses of electricity that might account for high or unusual electrical consumption, such as use of an electric sauna, a hot tub, a potter's kiln, or even a "grow operation" involving exotic flowers. <u>Although a proper showing of probable cause need not rule out all possibilities consistent with innocence, neither can it consist of an undifferentiated showing that, among multiple competing possibilities, one is consistent with guilt. Probable cause must at least point the finger of likelihood toward a possibility consistent with guilt.</u> [13]

Again applying the concept of "something more," the Alaska Court of Appeals in <u>State v. Crocker</u>[14] held that probable cause requires evidence that "points the finger" at criminal activity. In <u>Crocker,</u> law enforcement received a tip that marijuana plants were being cultivated at the residence of Debra Steik. Based on this tip, officers visited Steik's residence and smelled a strong odor of growing marijuana upon arrival at the front door. In addition to the officers' observations, electrical use records demonstrated higher than average consumption.

A search warrant was issued for the residence. Crocker argued that the search warrant was not supported by probable cause and the trial court agreed. The State of Alaska appealed and the Court of Appeals stated:

> [W]e conclude that even though the search warrant application established probable cause to believe that marijuana cultivation was being conducted inside the residence, the warrant application filed to establish probable cause to believe that this marijuana cultivation was for commercial purposes or that the amount of marijuana being cultivated exceeded the amount protected under *Ravin* and *Noy*.[15]

---

[13] 869 P.2d 625-626 (emphasis added).
[14] 97 P.3d 93 (Alaska Ct.App. 2004).
[15] 97 P.3d at 94.



ERIC DERLETH
— Trial Lawyer —

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-6815

RE: Motion to Suppress Two Search Warrants

The *Crocker* court distinguished between evidence of <u>legal</u> marijuana cultivation and evidence of <u>illegal</u> marijuana cultivation. Returning to the principal enumerated in <u>Carter,</u> the *Crocker* court required that probable cause be sustained by evidence that was sufficient to "point the finger" toward guilt and concluded that a "presumption" of non-criminality is built into the search and seizure clause of the Alaska Constitution.

*Saucier, Carter,* and *Crocker* are instructive here. In each of those cases, evidence demonstrated suspect behavior that might well have been consistent with culpability. However, this same evidence was consistent with non-culpable activity and, ultimately, in each of these cases the court concluded that probable cause did <u>not</u> exist.

Similarly, in this case there is no evidence of the "something more" necessary to establish probable cause that Marty Anderson committed "theft" of anything, let alone some yet-unidentified proprietary data worth over $31,000.

Finally, the question must be resolved what a reviewing trial court judge must do when confronted with a search warrant application that is misleading both for what it affirmatively offers and what it omits. Fortunately, this court can rely on the wisdom of Judge Mannheimer's extended concurring analysis directly on point – how to cure a malfunctioning search warrant affidavit:[16]

> It is true, as Matthews points out, that in cases where a search warrant application contains reckless misstatements of fact, the *Malkin* decision declares that "the misstatements must be excised and the remainder of the affidavit tested for probable cause". *Malkin,* 722 P.2d at 946. <u>But a moment's reflection will show that the quoted passage from *Malkin* is only a shorthand description of what should happen when a search warrant affidavit contains reckless material misstatements or omissions.</u>

> For instance, one cannot "excise" an omission. When an officer applying for a search warrant recklessly omits material information, the remedy is to correct the search warrant affidavit by *augmenting it* with the omitted information. *See State v. Anderson,* 73 P.3d 1242, 1246 (Alaska App. 2003); *Lewis v. State,* 9 P.3d 1028, 1033 (Alaska App. 2000).

---

[16] <u>Matthews v. State,</u> 2018 WL 2077843, at *5–7 (Alaska Ct. App. May 2, 2018)(unpublished)(internal citations and footnotes omitted).

RE: Motion to Suppress Two Search Warrants

COSPA0703



ERIC DERLETH
Trial Lawyer

386 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-0164
Fax (907) 262-8815



There are likewise instances where an affirmative misstatement of fact cannot be remedied simply by deleting the misstatement from the search warrant application.

Take, for instance, a hypothetical case where the officer applying for a search warrant mistakenly declares, "The suspect offered no explanation for his presence in the warehouse"—when, in fact, the suspect *did* offer an explanation when he was interviewed earlier by another officer, and the officer who applied for the warrant recklessly failed to confer with the other officer and find out about the suspect's earlier statement.

In such a case, excising the reckless misstatement from the warrant application does not begin to remedy the situation. In all likelihood, simply deleting the mistaken sentence would have little effect on whether the search warrant application established probable cause for the warrant. To achieve the purposes of *Malkin*, it would be necessary to *correct* the misstatement — i.e., to augment the search warrant application with the information that the suspect *did* offer an explanation for his presence at the warehouse.

There are also times when it is unclear whether a misstatement in a warrant application should be viewed as an affirmative misstatement or, instead, an omission. Take, for instance, a case in which the court finds that the officer applying for a search warrant recklessly misstated the facts when the officer asserted that a suspect "matched the description provided by an eyewitness"—when, in fact, the suspect matched only certain aspects of the witness's description.

Does the officer's assertion constitute an affirmative misstatement? Or is the problem that the officer omitted the clarifying phrase "certain aspects of"?

In my view, *Malkin* does not require courts to draw these kinds of linguistic and philosophical distinctions. Rather, *Malkin* requires courts to re-evaluate the sufficiency of the warrant application in light of the true facts.

Sometimes this will mean deleting false information from the warrant application. Sometimes this will mean augmenting the search warrant application with new information. And sometimes this will mean modifying the statements in the search warrant application so that they accurately reflect the facts.

This subject does not come up often in the reported cases. But there are a few courts — courts applying the corresponding rule of *Franks v. Delaware*[1] — who have recognized that correction of misstatements (by any appropriate means) is the proper approach to remedying reckless misstatements in a search warrant application.

The most cogent discussion of this point is found in *People v. Costello*, 204 Cal. App. 3d 431, 441–44 (Cal. App. 1988). *Costello* involved an investigation into a large theft of business and computer equipment. One of the paragraphs of the search warrant application mistakenly asserted that an officer had seen "three males" loading equipment into a truck, when in fact only one man was loading the equipment into the truck. Here is the text of the paragraph at issue:

EXHIBIT U
Page 14 of 23

Case 3:23-cv-00119-KFR   Document 34-22   Filed 05/06/25   Page 14 of 23

> *At 18:45 hrs. your affiant was advised by Det. Smith that approx. three males were loading unk. type equipment into a grn w/wht camper shell pick-up lic # 1H47873. This license shows in DMV to be a 1977 Toyota pick-up registered to Richard Lee Costello. The truck was seen backed into the driveway of 3148 Midway Dr. in front of the open garage. The garage light was out but the subjects were using a flashlight.*

The trial judge found that the misstatement about "three males" was reckless, and the appeals court upheld that trial judge's finding.[3]

The California appeals court then turned to the question of how to remedy the misstatement.

The trial judge in *Costello* had ruled that the entire quoted paragraph should be struck from the search warrant affidavit. The trial judge reasoned that the references to "three males" and to "the subjects" had to be excised — and that then, stripped of any reference to human actors, the paragraph no longer made any sense, and it should be deleted in its entirety.

The California appeals court criticized the trial judge for having "operated on the paragraph with an ax instead of a scalpel".[4] The court declared that the judge committed error by simply "striking out the inaccuracies" rather than correcting those inaccuracies.[5]

> The aim [of *Franks*] is not punitive but remedial — to make the affidavit read as it should have so that the reviewing court can then retest [it] for probable cause support. To that end, correction of the affidavit should not take one form (striking or adding) to the exclusion of the other. Where, as in this case, the defendant makes out a case for striking a misstatement, the proper remedy is to add back the true facts known to the affiant on that precise point ... rather than strike and jettison the passage altogether. That approach is especially critical where, as here, simply striking the misstatements leaves material unstricken facts standing out of context and ungrammatically stated. *Costello*, 251 Cal.Rptr. at 332 (citations omitted).

The appeals court explained that the trial judge should have corrected the search warrant affidavit so that it referred to only "one male" loading the truck and using the flashlight — and that the law required nothing more. The court pointed out that if strict excision were the only permitted remedy, then grammatical form would soon take precedence over substance: the police would simply learn to phrase their search warrant applications so that every individual assertion of fact was contained in its own isolated sentence:

> [N]othing in the rationale of *Franks* prevents a court from editing a partially stricken sentence so that its remaining contents can stand on their own. Otherwise, we put form over substance and encourage affiants to state each fact dryly, in separate sentences, avoiding all subordinate and dependent clauses, compound subjects and other rudiments of effective writing. *Ibid.*

ERIC DERLETH
Trial Lawyer

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-9915



ERIC DERLETH
— Trial Lawyer —

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-8815

*See also Frimmel v. Sanders*, 338 P.3d 972, 981 (Ariz. App. 2014) ("In order to [re-assess probable cause in light of the misstatements], we first redraft the affidavits to remove the falsehoods and add in material omitted facts."); *United States v. Ippolito*, 774 F.2d 1482, 1486-87 n. 1 (9th Cir. 1985) ("A better approach ... would be to delete false or misleading statements and insert the omitted truths revealed at the suppression hearing.").

Returning to Matthews's case, the misstatement in Detective Pyles's affidavit had nothing to do with the substance of the information he presented to the magistrate in Paragraphs 1 and 3 of the search warrant application. Rather, the problem was that Detective Pyles, by failing to amend the references to "I" and "me" in Paragraphs 1 and 3, seemingly asserted that the information in these paragraphs was the result of his own personal investigative efforts, rather than the result of investigation performed earlier by another member of the narcotics team.

The record indicates that the trial judge believed that the misstated pronouns were the result of negligence rather than recklessness. But even if the misstatements were reckless, the remedy would not be to strike the two paragraphs from the search warrant application in their entirety. Instead, the remedy is to re-draft the paragraphs so that they present the correct information (as revealed by the testimony at the evidentiary hearing).

IV.     Corrected Affidavit in Support of Search Warrant

Using the analysis supplied by Alaska Court of Appeals Judge David Mannheimer – who is well-respected given his nearly three decades on that court – this is how the affidavit of Ofc. David Bower *could have been written instead,* after adding the important facts omitted and correcting the facts that were wrong:

*My name is Officer David Bower and I work for Soldotna Police Department. On April 26, 2021 a fellow officer at SPD received a walk-in report from Russ Pack, who is apparently the Vice-President of a new company in our local community called Trident Engineering & Inspection. I have personally never heard of Trident before but I looked them up on the State of Alaska corporations and professional licensing website and found they are registered to do business in Alaska. I took over the investigation from the initial officer because I have some training in cyber-crimes and therefore I was a better fit for the investigation.*

*Mr. Pack immediately claimed that Martin "Marty" Anderson "stole" proprietary information from Trident. I have never heard of Mr. Anderson before.*

I took all the information from Mr. Pack and spent a long time going over his allegations with him personally, because it is my job to make sure that I understood both the facts and his possible motivation to accuse a local businessman like Mr. Anderson of something so heinous. If I had known of Mr. Anderson and he had a reputation as a criminal, or if Mr. Pack was just a disinterested citizen reporting a crime he stumbled across, I would have perhaps spent less time delving into not just Mr. Pack's allegations but the support for them given how serious what he was alleging was. I'm glad I spent that extra effort because there was much more to the story than Mr. Pack, and his business partner President of Trident James Hall, shared with me. I basically had to pry the full story out of them.

In addition to listening to Pack and Hall, I spent a considerable amount of time with Marty Anderson to get his version of events. Suffice it to say that I found Pack and Hall less than credible and Marty Anderson had back-up documentation for virtually everything he told me. That documentation helped me piece together what I think happened. Based on what I learned, I am asking for a search warrant to investigation potential felony and misdemeanor crimes – but not against Marty Anderson; rather, I think there is probable cause to believe Trident Engineering & Inspection, and more specifically its President James Hall, committed multiple crimes as explained herein. Those crimes include felony "Criminal Use of a Computer" (Alaska Statute §11.46.740(a)(1)); "Theft of Services" (A.S. §11.46.200(a)(3)); and "Criminal Mischief in the Fourth Degree" (A.S. §11.46.484(a)(3)).

Mr. Pack and Mr. Hall both claimed that Marty Anderson "stole" their proprietary information because he returned a company computer whose operating system had been reset to its factory settings. Both gentlemen were convinced that Anderson was going to use proprietary information that used to be on that computer to help their competitor, even though they were already in the process of closing their Alaska office. Upon closer examination, Trident's real complaint was not that Marty Anderson actually stole this information but that he had retained a copy of it for himself and might use it to benefit himself or some other company. I told these gentlemen that I viewed this as a "civil matter" and not criminal conduct. The reason I decided this was a civil matter, rather than a theft, was the fact that Trident still had a copy of all the data they claimed was stolen – this data was uploaded to Trident's servers each time Marty Anderson's computer(s) connected to the Internet.

I asked how long Marty Anderson was a Trident employee but could not seem to get a straight answer from Mr. Hall or Mr. Pack. They gave me a convoluted story about buying the business from Southern Services, Inc. (SSI) in Texas in January 2021, but that in reality they did not finalize the sale until mid-March because Anderson had an ongoing contract with SSI that had to be amended before the sale was complete.

RE: Motion to Suppress Two Search Warrants

ERIC DERLETH
Trial Lawyer

386 Heath Place
Soldotna, Alaska 99669
Ph (907) 262-9164
Fax (907) 262-8815



ERIC DERLETH
— Trial Lawyer —

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-8915

1  Pressing the issue with Trident further, it turned out that Marty Anderson was an
2  employee of the predecessor company SSI until just a few days before he was "hired"
3  by Trident. I found it very odd that Trident claimed they hired Marty Anderson on
   March 23 only to fire him the next day for some "violation of company policy." I was
4  never able to discern what policies Trident claimed that Anderson violated in the few
   hours he was allegedly an employee of Trident. Frankly, the hiring process was never
5  completed because Trident almost immediately fired Anderson and they never even
   had him complete the hiring packet (drug testing, which was required, was not
6  completed and neither was any of the other requisite paperwork for new-hires).

7  Most importantly, this officer learned from discussing the situation with Marty
8  Anderson that someone has been secretly and surreptitiously monitor his email he
9  has through a server with Brinkster.com.

10 Prior to Mr. Hall and his cohort Russ Pack reporting the alleged "theft" to SPD,
11 Trident purportedly hired Marty Anderson in a sham employment agreement, only
   to fire him the following day based on lies that he violated Trident's "policies and
12 procedures" (despite that there was no time for him to violate anything since he was
13 almost simultaneously hired and fired).

14 Prior to Trident (Pres. James Hall and VP Russ Pack) reporting the alleged "theft"
15 to SPD, Marty Anderson discovered that Trident had illegally accessed and surveilled
   him through the surreptitious acquisition of his private email password(s) that were
16 hosted on the server Brinkster.com (a server Marty had used for nearly two decades).

17 Prior to Trident reporting to SPD that Marty Anderson "stole" their data, Marty had
18 already reported Trident's illegal hacking to the FBI via the DOJ cyber-hacking web
   portal known as the Internet Crime Complaint Center (IC3).
19
20 Prior to Trident reporting the alleged theft, on April 17, 2021, Marty emailed the
   President and VP of Trident (James Hall and Russ Pack) and staff at the local Trident
21 office, that he discovered Trident's illegal hacking and surveillance, which had been
   going on for months and included his post-termination period. Marty included in the
22 email that he reported the hacking to Alaska Troopers and the FBI.
23
24 Prior to Trident reporting the alleged theft, Marty repeatedly had to track down his
   own email that was hosted by Brinkster.com, having found that it was moved to
25 something called Zimbra.com. After Marty found his email on Zimbra.com, he
26 changed his password again (this time on April 9, 2021). Despite changing the
   password, again Marty was unable to login to his email three days later.
27

RE: Motion to Suppress Two Search Warrants

1    Marty called Brinkster.com and they provided him the new password:
2    JamesHall123456 (Again, "James Hall" is the name of the President of Trident.)
     Prior to Trident reporting the alleged theft, Marty did a security scan of his personal
3    computer on April 9, 2021, which indicated his personal email was accessible by one
     application, listed as: "Trident Alaska" and associated with his personal email
4    martya@usalaska.biz – there was no reason for this email to be associated with
5    Trident Alaska.

6    Prior to Trident reporting the alleged theft, Marty also found that his LinkedIn.com
7    account was hacked and some unknown person posted his former business known
     as Alaska Technical Training website on his LinkedIn home page, where it also listed
8    two Trident-owned domains: AlaskaNDT.com and AlaskaNDT.org.  Notably,
9    Alaska Technical Training is the same business that Marty Anderson sold to Texas
     company Southern Services, Inc., which in turn sold the business to Trident.



ERIC DERLETH
— Trial Lawyer —

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-6815

10
11   Prior to Trident reporting the alleged theft, Marty contacted OSHA and made a
     whistleblower complaint for numerous safety violations that he observed while
12   working as a contractor to Trident, and he spoke to OSHA personnel about these
13   allegations a few days later.

14   Prior to Trident reporting the alleged theft, Trident learned through its illegal access
15   into Marty Anderson's email that he received two job offers just after his sham
     termination, one offer from Precision NDT in New Mexico and the other from
16   Blackhawk Engineering in Illinois. This led to Trident's lawyer sending both
17   employers threatening so-called "Cease and Desist" letters, essentially accusing Marty
     of misappropriation without evidence to try to get him fired (again).
18
19   This officer has been doing police work for a very long time, so it was no surprise
     that both owners of Trident Engineering, James Hall and Russ Pack, vehemently
20   denied having anything to do with hacking Marty Anderson's computer or that either
     was involved in changing his password to "JamesHall123456" – that much was
21   expected.  However, neither gentleman bothered to mention that before they came
22   to Soldotna Police to make "theft" allegations against Marty Anderson, that Anderson
     sent an email to both Hall and Pack, and to their local rep Brittany Winkler, as well
23   as two of the principals from SSI, informing all of them that Marty Anderson's email
     account hosted on Brinkster.com's server was compromised and that Anderson had
24   reported Trident to the FBI's website known to me as "IC3" for Internet crimes.
25   Again, it was no surprise that James Hall and Russ Pack denied being the person(s)
     who hacked Mr. Anderson's account – but this officer found it disturbing that they
26   knew all about his allegation and failed to mention it so I could investigate it while
27   deciding whether to credit their story that Anderson "stole" their proprietary data.

RE: Motion to Suppress Two Search Warrants

EXHIBIT U
Page 19 of 23

*Marty Anderson provided me with all the screenshots and photos from his efforts to regain control of his own private email account hosted on the Brinkster.com server. He was able to show me step-by-step how he discovered that he lost control of his private email, and how he went about working with Brinkster.com to reassert his control, and how even when he would change the password it was compromised yet again. Anderson showed me photos after he did a security scan on his personal laptop that showed one of the devices connected was "Trident Engineering" but associated with his personal email. He also showed me the password that someone created that was found to be "JamesHall123456" – while that certainly does not necessarily mean James Hall or anyone else at Trident was responsible for creating that password, it concerns me that neither Mr. Hall nor Mr. Pack told me about Marty Anderson's email accusing them of compromising his email system. Mr. Anderson is willing to swear under oath by Affidavit that he did not do it, and if it was someone working for Trident that would be a crime. Thus, the search warrant requested here so that this officer can subpoena the computer records starting with Brinkster.com to find out what was the prices IP address of the computer used to access and apparently manipulate Mr. Anderson's private email on that server.*

*Marty Anderson explained that while working for SSI, he provided his personal email credentials to SSI employee Brittany Winkler because she was doing some work on SSI's website. It is possible that Ms. Winkler provided those credentials (username and password) to someone at Trident, even inadvertently. That would explain how Trident was able to login to Mr. Anderson's email. Further, Trident's President James Hall now admits that he loaded software on Anderson's work computer that allowed him to track everything Anderson did on the computer. Since Mr. Anderson repeatedly cloned/mirrored his work laptop with his personal laptop, through the services of Computer Renaissance in Soldotna, it is possible that whatever software Trident installed on the work computer was cloned onto Mr. Anderson's personal laptop. That would also provide an innocuous reason why Anderson's personal computer logged into Trident's server after he was fired.*

*While Trident originally told me that their "IT Department" would provide a valuation for their proprietary data they accuse Marty Anderson of "stealing" from them, it turns out that there was no IT Department. Instead, it was just Trident President James Hall providing without support an alleged value of the information "stolen" from Trident (and despite that Trident still has the exact same data in their continuous care, custody and control). Upon closer examination, this officer now believes that Trident does not have, or at least has yet to provide, backup documentation to justify their self-interested valuation that the data allegedly stolen by Marty Anderson was worth over $31,000. It appears that indeed no data was stolen in the traditional sense, whereby Anderson deprived the owners of their property.*

ERIC DERLETH
— Trial Lawyer —

388 Heath Place
Soldotna, Alaska 99669
Ph (907) 262-9164
Fax (907) 262-9815



**ERIC DERLETH**
— Trial Lawyer —

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-8815

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

*Based on the totality of the circumstances, including Marty Anderson's unblemished record of community service and professional accomplishments, compared to the dubious and cherry-picked allegations made by Trident's President and Vice-President which left out myriad facts that put their accusations in a much different context, this officer requests search warrants against Trident Engineering and Inspection and its chief executive officers James Hall and Russ Pack. The computers used by Mr. Hall and Mr. Pack, and any local agents, should be reviewed in their entirety to examine whether they have any evidence to support their allegations against Marty Anderson; moreover, their computers need to be reviewed to determine whether anyone from Trident compromised Mr. Anderson's private email system and possible committed crimes by doing so.*

*Rather than Marty Anderson "stealing" any proprietary data from Trident, this officer found that his conduct in securing his own personal information on his laptop and returning the company's laptop after removing his personal information was justified. Specifically, Trident finally admitted after being pressed that all of the data they claim was stolen by Mr. Anderson actually still exists in the care, custody and control. Moreover, they have no evidence that Anderson provided propriety information from Trident to anyone outside that organization. Finally, even if Marty Anderson did share some unidentified information from Trident with others outside the company, this would be an issue for <u>civil</u> court – it does not amount to a crime.*

## V.     In Conclusion: The Search Warrants Must be Suppressed

First, the search warrants authorized here are much too broad. The warrant purport to give Soldotna Police and any computer expert with whom they associate to dig around in every nook-and-cranny of Marty Anderson's computer. As explained in detailed herein, Mr. Anderson's computer contains work product and training materials he has produced and published over decades in the oil patch. It appears that someone compromised his private email server and has possibly been surreptitiously monitoring all of his emails and other communications since late December. Despite knowing that Mr. Anderson reported this illegal surveillance – essentially cyberhacking – to the FBI and accused Trident of involvement therein, Trident's two principals did not bother to mention these circumstances to SPD Ofc. Bower as they tried to manipulate the investigation.

RE: Motion to Suppress Two Search Warrants

EXHIBIT U
Page 21 of 23

The search warrants are not limited to finding the allegedly stolen proprietary data; rather, the warrants are so broad as to be akin to a warrant to conduct a prohibited general search. But such authorization even pursuant to a warrant is not constitutionally permissible, given that the explicit language of the Fourth Amendment mandates that a search warrant "particularly describ[e] the place and to be searched" and the "persons or things to be seized." Here, the broad search warrant issued should not be allowed to be used as a vehicle to probe every corner of Mr. Anderson's computer and then hand that information over to Trident and its suspect actors.

Finally, the search warrant application here – after correcting the bad facts and adding the unjustifiable omissions – does not contain enough evidence to "point a finger" at guilt; in other words, there is insufficient information to overcome the <u>presumption of non-criminality</u> that is "built into" the search and seizure clause of the Alaska Constitution and our commensurate statutory law governing issuance of search warrants.[17]

Instead, the circumstances here more probably suggest that if anyone committed a serious crime it was Trident and its principals. That is more probable than the notion that a man with no criminal record decided to commit multiple computer crimes, out in the open, by merely copying his work computer onto his personal laptop to protect his lifetime's work and to preserve work product that his many certifications and classifications required him to do should he be audited or apply to renew some or all of his relevant certificate and/or licenses.

DATED at Soldotna, AK on June 1, 2021.

Respectfully submitted,
ERIC DERLETH – TRIAL LAWYER, Inc.



Eric Derleth (AkBA #9609042)
Attorney for Movant Martin Anderson

---

[17] <u>State v. Crocker</u>, 97 P.3d at 96.

RE: Motion to Suppress Two Search Warrants

EXHIBIT U
Page 22 of 23

ERIC DERLETH
Trial Lawyer

388 Heath Place
Soldotna, Alaska 99669
Ph. (907) 262-9164
Fax (907) 262-8615

1

<u>CERTIFICATE OF SERVICE:</u>

A copy of the foregoing was served on the following parties by email on 06/01/2021:

2

Scot.Leaders@alaska.gov (Kenai District Attorney)
dbower@soldotna.org (Soldotna Police Officer who secured the warrants)

3

4

5

By:_____
For: Eric Derleth

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

RE: Motion to Suppress Two Search Warrants

COS, Page 23 of 24